

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 8939 | **DATE** | 5/25/2000 |
| **CASE TITLE** | Gary McKnight vs. Kenneth A. Dean, et al | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendants' motion for summary judgment on all of McKnight's legal malpractice claims are granted. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | MAY 3 0 2000 | | |
| | Notified counsel by telephone. | | date docketed | | 61 |
| ✓ | Docketing to mail notices. | | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| TBK | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GARY McKNIGHT      )
      )
   Plaintiff,     )
      )
   v.       )   **No. 97 C 8939**
      )   **Paul E. Plunkett, Senior Judge**
KENNETH A. DEAN,     )
DAVID A. AXELROD,    )
DAVID A. AXELROD & ASSOCIATES, )
MARK WETTERQUIST, and   )
SHOENBERG, FISHER, NEWMAN & )
ROSENBERG, LTD.     )
      )
   Defendants.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Gary McKnight filed a one-count complaint against defendants Kenneth A. Dean, David A. Axelrod, David A. Axelrod & Associates, Mark Wetterquist[1], and Shoenberg, Fisher, Newman & Rosenberg, Ltd. for legal malpractice. Defendants move for summary judgment on McKnight's claim pursuant to Federal Rule of Civil Procedure ("Rule") 56.[2] For the reasons stated herein, we grant defendants' motion for summary judgment.

---

[1]    The Court granted plaintiff's agreed motion to dismiss his claim against Mark Wetterquist on March 19, 1998. (3/19/98 Min. Order.)

[2]    Defendants David A. Axelrod ("Axelrod"), David A. Axelrod & Associates, and Shoenberg, Fisher, Newman & Rosenberg, Ltd. (collectively "Axelrod Defendants") file a joint motion for summary judgment, while defendant Dean files his own motion. However, for the most part, we discuss and refer to the defendants collectively because they collectively engaged or failed to engage in the activities of which McKnight complains in this action. We also refer to the defendants' motions as a single motion because Dean and Axelrod Defendants have presented the same arguments or have adopted the arguments of the other.

## Facts[3]

As a preliminary matter, we review this case pursuant to our jurisdiction over matters between residents of different states. McKnight pleads and defendants admit that he is a resident of the State of New Jersey and defendants are residents of the State of Illinois, thereby resulting in complete diversity of citizenship between plaintiff and defendants. He further claims damages in excess of $75,000.00. Thus, we have jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

The facts of this case are numerous and messy. In the 1980's, McKnight sued General Motors, his former employer, for discrimination. He won and won big to the tune of some $610,000.00. However, on appeal a major part of his judgment was reversed apparently because his lawyers waived a critical position. McKnight sued his former attorneys from the discrimination suit for malpractice. He settled the case for nearly three quarters of a million dollars. McKnight, however, had another string to his bow. He has now filed suit against his attorneys who represented him in the underlying legal malpractice action claiming more malpractice. McKnight has either been more sinned against than a sinner or he is a professional litigant; whichever the case, this is the end of the saga.

Given that we must review, in some capacity, the facts from each of the three case layers (the original employment discrimination suit, the underlying legal malpractice suit, and the instant legal malpractice suit), we will start from where it all began.

---

[3]     These facts are undisputed and are taken from the parties' statements filed in accordance with this district's local rule ("L.R.") 56.1. We present and construe the agreed facts in the light most favorable to McKnight, the non-moving party.

## Original Employment Discrimination Suit

McKnight went to work for General Motors ("GM") in 1978 as a manufacturing supervisor. (Axelrod Defs.'[4] L.R. 56.1(a)(3) Stmt. ¶ 7.) He was terminated by GM in late 1983. (Id. ¶ 12.) In 1986, McKnight retained the services of the Madison, Wisconsin law firm of Fox, Fox, Schaefer & Gingras ("Wisconsin Attorneys") to file a federal lawsuit against GM surrounding his employment and termination. (Id. ¶13.) Robert Gingras, one of the Wisconsin Attorneys, filed a complaint on behalf of McKnight against GM in the Eastern District of Wisconsin on March 5, 1987, claiming that McKnight's termination was due to racial discrimination and in retaliation for the prior complaints[5] that he had filed against GM regarding race discrimination and racial harassment. (Id. ¶ 15.) In Count I, McKnight sought relief under Title VII for back pay (including prejudgment interest), reinstatement, attorneys' fees and employee benefits, and in Count II, he asserted a claim pursuant to 42 U.S.C. § 1981 ("section 1981"), seeking compensatory and punitive damages plus lost wages, employment benefits, loss of future earning capacity and loss of reputation. (Id. ¶ 16.)

The case went to trial in early October 1988. The jury returned a verdict in favor of McKnight on both the discrimination claim and the retaliation claim. (Id. ¶ 22.) The jury awarded McKnight $55,000.00 for lost wages and fringe benefits under the Title VII claim, $55,000.00 for

---

[4] Defendant Dean also filed his own L.R. 56.1(a)(3) statement. However, every one of Dean's statements is represented in the Axelrod defendants' L.R. 56.1(a)(3) statement. Thus, we refer only to Axelrod Defendants' statements because the agreed facts stated therein refer equally to the Axelrod Defendants and Dean.

[5] In late 1981, McKnight was laid off by GM. (Axelrod Defs.' L.R. 56.1(a)(3) Stmt. ¶ 8.) He subsequently filed a discrimination claim with the E.E.O.C. in Wisconsin and sued GM in Wisconsin state court for discrimination in the layoff. (Id. ¶¶ 8, 9) Although a jury awarded him $80,000.00, the district court rendered a verdict for GM based on the jury's answer to a question on a special verdict. (Pl.'s L.R. 56.1(b)(3) Stmt. ¶ 4.) In February 1982, GM recalled plaintiff and assigned him to a manufacturing supervisor position. (Id. ¶ 2.)

pain and suffering and physical and emotional distress under the section 1981 claim and $500,000.00 in punitive damages as permitted under section 1981. (Id.) The jury refused to award McKnight any damages for "loss of future earning capacity" caused by GM's conduct. (Id.) McKnight testified at trial that he worked as a stockbroker after he was fired from GM. (Id. ¶¶ 44-46, 50-52.) At the time he was terminated by GM, McKnight was making approximately $35,000.00 per year, plus benefits. (Id. ¶ 44.) While McKnight's earnings fluctuated from year to year as a stockbroker, in 1987, the year before the trial, McKnight testified that he earned $ 54,000.00 plus health insurance benefits. (Id. ¶ 50; id., Ex. 3, McKnight v. General Motors Corp. Trial Tr. IV(B), at 41.)

After the trial, both McKnight and GM filed post-trial motions. Gingras, on behalf of McKnight, filed a motion to amend the judgment to provide for McKnight's reinstatement in his prior position or to a comparable position at GM. (Id. ¶ 24.) GM filed a motion seeking a judgment notwithstanding the verdict or, in the alternative, an order amending the judgment to strike the award of punitive damages and reduce the amount of compensatory damages. (Id.) Judge Myron L. Gordon, the district court judge who presided over the trial, denied both parties' motions and affirmed the jury's verdict. (Id. ¶ 30.) Both parties appealed.

GM claimed on appeal that pursuant to a recent Supreme Court decision in Patterson v. McLean Credit Union, 491 U.S. 164 (1989), McKnight's section 1981 claim was not viable. (Id. ¶ 33.) The Seventh Circuit agreed, although it held that GM may have waived its right to invoke Patterson. (Id. ¶ 34.) However, the court noted that McKnight, through his counsel, had himself abandoned any defense of waiver because he failed to raise it before the Seventh Circuit. (Id.) Thus, the court set aside the Section 1981 award, which was comprised of the $55,000.00 award for pain and suffering and the punitive damages award of $500,000.00. (Id. ¶ 33.) It affirmed the $55,000.00

award for back pay and remanded to the district court for reconsideration of reinstatement or front pay under Title VII. (Id.)

On remand, McKnight asked Judge Gordon to reopen the record to receive additional evidentiary submissions on the question of reinstatement and the amount of front pay. (Id. ¶ 36.) The additional evidence would have related to McKnight's current, post-trial financial condition for the determination of front pay or reinstatement. (Id. ¶ 37.) On July 15, 1991, Judge Gordon denied McKnight's request, holding that the record was fully established as of the end of trial. (Id. ¶ 39.) The court went on to hold that based on the evidence at trial that McKnight was gainfully employed after he was terminated from GM that neither reinstatement nor an award of front pay was appropriate under Title VII. (Id. ¶¶ 40-41; id., Ex. 5, Doc. No. 02792, McKnight v. General Motors Corp., 768 F. Supp. 675, 678 (E.D. Wis. 1991).)

McKnight sought reconsideration of the court's ruling and filed an affidavit stating his job history from the time of the verdict in 1988 until the time of the court's decision. (Id. ¶¶ 42-43.) The court denied it and, with new counsel, McKnight appealed the court's denial of his request for reinstatement or front pay and prejudgment interest on the back pay award. (Id. ¶¶ 57-58.) In September 1992, the Seventh Circuit in a written opinion affirmed the district court's denial. (Id. ¶¶ 62-64; id., Ex. 14, McKnight v. General Motors Corp., 973 F.2d 1366 (7th Cir. 1992).)

## Underlying Legal Malpractice Case Against Wisconsin Attorneys

Prior to the filing of McKnight's legal malpractice action against the Wisconsin Attorneys, he was embroiled in a dispute over fees owed to the Wisconsin Attorneys for representation during the GM employment discrimination suit. The fee dispute is relevant because, as discussed herein,

defendants represented McKnight in the fee dispute, and the shadow of defendants' actions from that dispute fall within the conduct complained of in the instant action.

Sometime after the verdict and before the first appeal, Judge Gordon entered an order awarding McKnight attorneys' fees of $57,125.70 through December 31, 1988. (Id. ¶ 66.) These fees were stipulated to by the parties and GM paid this amount into a court fund. (Id.) At some point after the trial, Gingras left the Fox & Fox firm. (Id. ¶ 67.) In September 1991, after the district court entered its final order on the remand issues, Fox & Fox filed a notice of attorney's lien in the employment discrimination law suit against GM. (Id. ¶ 68.) A few months later, while the case was on its second appeal to the Seventh Circuit, Fox & Fox and Gingras each filed motions to intervene in McKnight v. General Motors. (Id. ¶ 69.) Around this same time, McKnight had discussions with defendants Dean and Axelrod regarding a possible malpractice claim against the Wisconsin Attorneys. (Id. ¶ 82.) In February 1993, McKnight executed a fee agreement with Dean and Axelrod for representation in a possible legal malpractice action against the Wisconsin Attorneys. (Id. ¶¶ 83-84; id., Ex. 2, McKnight Dep., Exs. 13, 36.) At some point after that in early 1993, defendants sent a demand letter on behalf of McKnight to the Wisconsin Attorneys claiming he had been injured by their malpractice. (Id. ¶ 87.) On March 23, 1993, Fox & Fox filed a separate complaint against McKnight in state court in Dane County, Wisconsin for an injunction to recover attorneys' fees from the still pending employment discrimination action. (Id. ¶ 70.) Gingras was not a party to this suit. (Id. ¶ 74.) Dean and Axelrod agreed to represent McKnight in both the intervention matter and the separate state suit. (Id. ¶¶ 71, 76; id., Ex. 5, Doc. No. 07856.)

McKnight, through defendants, responded to the motion to intervene by arguing that the attorneys' fees awarded to the Wisconsin Attorneys should be reduced by the various expenditures

paid by McKnight. (Id. ¶ 72; Pl.'s L.R. 56.1(b)(3) Stmt. ¶ 28.) Judge Gordon entered his final order

for the GM employment discrimination case in June 1993. (Axelrod Defs.' L.R. 56.1(a)(3) Stmt.

¶ 73.) At that time, he divided the attorneys' fees already paid into a fund by GM among Fox & Fox

($50,585.17), Gingras ($12,646.29) and McKnight ($13,146.48). (Id.)

In October 1993, after Judge Gordon's division of fees, Fox & Fox amended their state law

complaint against McKnight in Dane County for additional fees owed to it. (Id. ¶ 74.) Fox & Fox

claimed they were owed an additional $15,469.43 for its representation of McKnight on the Title VII

claim through December 31, 1988. (Id.) Dean and Axelrod, on behalf of McKnight, answered the

complaint and filed affirmative defenses, including an affirmative defense of legal malpractice

against the Fox & Fox firm. (Id. ¶ 77.)

In June 1994, on the morning of trial on the state court fee action, defendants moved to

withdraw McKnight's affirmative defense of legal malpractice. (Id. ¶ 78.) They did so after they

conducted research and spoke to McKnight about the reasons why they believed they did not have

to litigate the legal malpractice issue in state court. (Id. ¶ 79; Pl.'s L.R. 56.1(b)(3) Stmt. ¶¶ 36-41.)

The research indicated that the affirmative defense of legal malpractice in the state court fee case

might interfere with McKnight's then pending federal legal malpractice claim if McKnight lost on

the affirmative defense in state court. (Pl.'s L.R. 56.1(b)(3) Stmt. ¶¶ 36-38.) The trial court granted

the motion to withdraw but noted that it was done "at your [McKnight's] peril." (Id. ¶ 44; Axelrod

Defs.' L.R. 56.1(a)(3) Stmt., Ex. 5, Doc. No. 02653-4.) Defendants stated to the court that no

prejudice would result to Fox & Fox from the withdrawal because there had been no discovery on

the malpractice claim. (Pl.'s L.R. 56.1(b)(3) Stmt. ¶ 43; Axelrod Defs.' L.R. 56.1(a)(3) Stmt., Ex.

5, Doc. No. 02648.) After the close of evidence on the fee dispute, the state court entered a judgment in favor of Fox & Fox in the amount of $12,886.30. (Axelrod Defs.' L.R. 56.1(a)(3) Stmt. ¶ 81.)

On May 27, 1994, between the time McKnight answered Fox & Fox's state court fee complaint, and the June 1994 bench trial, defendants, on behalf of McKnight, filed a legal malpractice claim against the Wisconsin Attorneys in the United States District Court for the Northern District of Illinois. (Id. ¶ 88; Pl.'s L.R. 56.1(b)(3) Stmt., Ex. 3, McKnight v. Gingras, et al., 94 C 834.) The case was subsequently transferred to the Eastern District of Wisconsin where it was assigned to Judge Rudolph T. Randa. (Axelrod Defs.' L.R. 56.1(a)(3) Stmt. ¶ 89.) In his complaint, McKnight alleged five separate claims of legal malpractice. He claimed that Gingras was negligent when he failed to prepare and file a brief in support of McKnight's claims for reinstatement and front pay and that the Wisconsin Attorneys, including Gingras, were negligent when they: (1) failed to argue on appeal that GM had failed to properly preserve its Patterson defense for appeal; (2) failed to hire an expert witness regarding McKnight's' claims for permanent career damages; (3) miscalculated the amount of back pay and benefits due McKnight from GM; and (4) failed to raise McKnight's claims for prejudgment interest before the trial court. (Pl.'s L.R. 56.1(b)(3) Stmt., Ex. 3, McKnight v. Gingras, et al., 94 C 834.)

The Wisconsin Attorneys subsequently filed a motion for summary judgment claiming that any claims of legal malpractice prior to December 31, 1988 were barred by McKnight's withdrawal of the affirmative defense of legal malpractice in the Wisconsin fee action brought by Fox & Fox. (Axelrod Defs.' L.R. 56.1(a)(3) Stmt. ¶ 90.) In March 1996, Judge Randa granted the Wisconsin Attorneys' motion for summary judgment, barring any claims of legal malpractice prior to December 31, 1988. (Id. ¶ 93; id., Ex. 5, Doc. No. 02263.) Thus, two of McKnight's five claims survived

because they involved post-1988 conduct: (1) the Wisconsin Attorneys' failure to raise the waiver argument in the appeal by GM; and (2) Gingras' failure to file a brief with respect to the issue of reinstatement and front pay. (Id., Ex. 5, Doc. No. 02273.)

The case proceeded through discovery on the two remaining issues. In February 1997, the Wisconsin Attorneys answered interrogatories indicating that they were covered under an insurance policy issued by CNA Lawyer's Professional Liability in the amount of $1,000,000.00, with declining limits from which attorneys' fees and costs were deducted. (Id. ¶ 94.) During discovery, defendants retained an expert, David Cannon, Esq., to issue an opinion as to McKnight's remaining waiver and front pay/reinstatement claims. (Id. ¶ 95; Pl.'s L.R. 56.1(b)(3) Stmt. ¶ 49.) After reviewing certain materials, not including the trial transcript in the underlying employment discrimination case, Cannon formed an opinion that Gingras had not committed malpractice with respect to his failure to brief the front pay/reinstatement issue on remand because Cannon assumed that all of the facts relevant to those issues had been raised previously before Judge Gordon. (Pl.'s L.R. 56.1(b)(3) Stmt. ¶¶ 49-50; Axelrod Defs.' L.R. 56.1(a)(3) Stmt. ¶ 95; id., Ex. 5, Doc. No. 04685.) However, Cannon was of the opinion that the Wisconsin Attorneys had most likely committed malpractice by failing to raise GM's waiver on appeal. (Axelrod Defs.' L.R. 56.1(a)(3) Stmt. ¶ 95; id., Ex. 5, Doc. No. 04685.)

In response to the Wisconsin Attorneys' second motion for partial summary judgment in November 1996, defendants filed a motion for partial summary judgment on McKnight's claim against the Wisconsin Attorneys for failing to raise the waiver argument on appeal. (Id. ¶¶ 96-97.) In June 1997, Judge Randa granted McKnight's motion for summary judgment that the Wisconsin Attorneys were negligent in their representation of McKnight on appeal and that, as a matter of law,

their negligence proximately caused McKnight to sustain damages. (Id. ¶ 99; id., Ex. 5, Doc. No. 00003.)

Soon after the partial summary judgment ruling, the Wisconsin Attorneys requested that the parties attempt to settle the matter through non-binding mediation. (Id. ¶ 100.) The parties agreed to participate in a mediation that was held in Chicago, Illinois on July 11, 1997. (Id.) While McKnight did not want to attend the mediation, he agreed to do so when defendants paid for his travel expenses to the mediation. (Id. ¶ 100.) During the course of the mediation, McKnight rejected certain monetary offers by the Wisconsin Attorneys to settle the matter. (Id. ¶ 104.) After mediating the issues for over seven hours, the mediator stated that an agreement in principle had been reached to settle the case for $750,000.00, with a confidentiality provision. (Id. ¶ 105.) McKnight rejected the settlement and asked for additional funds if he had to agree to the confidentiality provision that the Wisconsin Attorneys sought. (Id.) At that time, Dean and Axelrod told McKnight again that the Wisconsin Attorneys had a policy limit of $1,000,000.00 minus the Wisconsin Attorneys' attorneys' fees. (Pl.'s L.R. 56.1(b)(3) Stmt. ¶ 56; Axelrod Defs.' L.R. 56.1(a)(3) Stmt., Ex. 2, McKnight Dep. at 276-302.) McKnight does not remember discussing with defendants that he could pursue the personal assets of the Wisconsin Attorneys. (Pl.'s L.R. 56.1(b)(3) Stmt. ¶ 56; Axelrod Defs.' L.R. 56.1(a)(3) Stmt., Ex. 2, McKnight Dep. at 302.)

Eventually, McKnight agreed to settle the entire legal malpractice suit for the total sum of $765,000.00. (Axelrod Defs.' L.R. 56.1(a)(3) Stmt. ¶ 106.) As a part of the settlement, McKnight also entered into a revised agreement with defendants regarding Dean and Axelrod's fees. (Id. ¶ 107.) As a result, McKnight received $475,000.00 and defendants received $290,000.00 from the total $765,000.00 settlement check from CNA. (Id.) Also as a part of the revised agreement,

defendants satisfied in full the $16,000.00 judgment against McKnight in the Fox & Fox fee action in the Dane County, Wisconsin case. (Id.; id., Ex. 5, Doc. No. 04710.) The underlying legal malpractice suit was subsequently dismissed with prejudice. (Id. ¶ 108.)


**Instant Legal Malpractice Action Against Defendants**

Just months after the underlying legal malpractice case was settled, on December 29, 1997, McKnight filed the instant legal malpractice suit against defendants.[6] (Id. ¶ 110.) In his First Amended Complaint, McKnight alleges that defendants departed from accepted standards of practice by:

> (a) Carelessly and negligently alerting the Wisconsin attorneys to McKnight's claim before filing suit, thus allowing the Wisconsin attorneys to file suit against McKnight in state court as a preemptive strike;
>
> (b) Carelessly and negligently waiv[ing] McKnight's claims against the Wisconsin attorneys for their pre-December 31, 1988 conduct by withdrawing his affirmative defense in the Fox & Fox suit;
>
> (c) Carelessly and negligently advising McKnight that his only recovery against the Wisconsin attorneys could be from a malpractice insurance policy.

(Id.; id., Ex. 6, Pl.'s First Am. Compl. ¶ 34(a)-(c).)

We now turned to defendants' motion for summary judgment on McKnight's three part malpractice claim.

---

[6]    In light of the short proximity between the time of settlement and this suit, we are puzzled why McKnight permitted payment of $290,000.00 in legal fees to defendants if he was so unsatisfied with their representation at the time he settled the underlying malpractice action. It seems to us that he should have raised his dissatisfaction with defendants by holding on to or refusing to release defendants' share of the settlement pie.

## Motion For Summary Judgment

### Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The moving party bears the initial burden of identifying the portions of the record which it believes demonstrate the absence of a genuine issue of material fact and entitle it to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). We view all evidence and the inferences from it in the light most favorable to the non-moving party. Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 335 (7th Cir. 1991).

Once a properly supported motion for summary judgment has been filed, the non-moving party must set forth specific facts showing there is a genuine issue for trial. Anderson, 477 U.S. at 248. An issue of fact is genuine only if a jury could reasonably return a verdict for the non-moving party. Id.

### Choice of Law

Before we address the merits of defendants' motion, we must first address whether the laws of the State of Illinois or Wisconsin apply to McKnight's legal malpractice claims. A federal court sitting in diversity applies the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). In tort actions like the one at bar, Illinois applies the "most

significant relationship" test to determine the applicable substantive law. Ingersoll v. Klein, 46 Ill. 2d 42, 262 N.E.2d 593 (1970). Four factors are particularly important in determining which state has the most significant relationship to the parties and the occurrence at issue: (1) the place of injury; (2) the place of the conduct causing the injury; (3) the domicile and the place of business of the parties; and (4) the place where the parties' relationship is centered. Ingersoll, 46 Ill. 2d at 47-48, 262 N.E.2d at 596. Under the most significant relationship test, the law of the state in which the injury occurred governs a tort dispute unless Illinois has a more significant relationship to the occurrence or the parties involved. Miller v. Long-Airdox Co., 914 F.2d 976, 978 (7th Cir. 1990). As the Seventh Circuit has recently remarked, "the highest scorer on the 'most significant relationship' test is the place where the tort occurred." Spinozzi v. ITT Sheraton Corp., 174 F.3d 842, 844 (7th Cir. 1999).

We shall first look at which state scores higher on the two factors that look to the place where the tort occurred. The place of injury and the place of conduct causing injury factors do not clearly favor Wisconsin or Illinois. While Wisconsin was the location of the employment discrimination case, the Fox & Fox fee dispute and the federal legal malpractice case, McKnight also complains of conduct that occurred in Illinois, namely that he was never told before he settled the matter at the mediation in Chicago, Illinois that he could obtain more money from the Wisconsin Attorneys through their personal assets. Furthermore, it does not appear that McKnight was a resident of Wisconsin when some or all of the injuries were inflicted. This cuts against Wisconsin as the higher scorer on these factors. In Spinozzi, supra, the Seventh Circuit found the place where the tort occurred usually has the greatest interest in having its laws applied because "most people affected, whether as victims or as injurers, by accidents or other injury-causing events are residents of the

jurisdiction in which the event takes place." Spinozzi, 174 F.3d at 845. In this case, we have the unusual situation where neither the victim nor injurers is a resident of Wisconsin, the place where much of the injury causing conduct took place. Thus, we look to the other two factors to determine which state's law to apply.

The third factor looks to the domicile and place of business of the parties. The parties agree that defendants have their principle place of business in Illinois and McKnight is a resident of the State of New Jersey. This factor, combined with the first two, appears to favor Illinois. The last factor, the place where the parties' relationship is centered, also favors Illinois. The parties entered into several different agreements in Illinois regarding fee agreements and representation of McKnight in the underlying legal malpractice case.

In addition to simply tallying the relationship factors, which is inconclusive on the first two and appears to favor Illinois on the last two, we should weigh the significance of the factors with regard to the nature of the cause of action to determine which state has a superior interest in having its policy applied in a particular case. Vickrey v. Caterpillar Tractor Co., 146 Ill. App. 3d 1023, 1026, 497 N.E.2d 814, 817 (4th Dist. 1986). This action revolves around a claim of malpractice of attorneys licensed and engaged in the active practice of law in Illinois. Thus, Illinois, as the state charged with overseeing the conduct of its licensed professionals, has the greater interest in having its laws regarding legal malpractice apply to the instant suit. See Marlow v. Winston & Strawn, No. 90 C 5715, 1992 WL 56687, at *4 (N.D. Ill. Feb. 11, 1992) (finding that when the other factors were inconclusive, Illinois had a superior interest over another state in having its laws apply to a legal malpractice case involving Illinois licensed attorneys). Thus, while we find that the law of Illinois should govern the present action, the laws of Wisconsin and Illinois are virtually identical on legal

-14-

malpractice. So in the end, while the substantive law may be the same for the two jurisdictions, we apply Illinois law in the event there are subtle differences that may impact our ruling today.

## Merits of Summary Judgment Motion

In order to survive the defendants' motion for summary judgment, plaintiff must show that there is a genuine issue of material fact to support his claim that defendants committed legal malpractice in their representation of him in the underlying legal malpractice claim. To recover for legal malpractice in Illinois, a plaintiff must prove the existence of an attorney-client relationship, a duty arising from that relationship, a negligent act or omission that breached that duty, proximate cause such that "but for" the attorney's negligence the plaintiff would have prevailed in the underlying action and actual damages. See Beatty v. Wood, 204 F.3d 713, 715 (7th Cir. 2000) (citing Lucey v. Law Offices of Pretzel & Stouffer, Chtd., 301 Ill. App. 3d 349, 703 N.E.2d 473 (1st Dist. 1998)); Metrick v. Chatz, 266 Ill. App. 3d 649, 652, 639 N.E.2d 198, 200 (1st Dist. 1994). In order to succeed on such a claim, the plaintiff must show that his underlying case, in this case his underlying legal malpractice claim, was meritorious. Beatty, 204 F.3d at 715. That is, the plaintiff is required to prove a "case-within-a-case." Sheppard v. Krol, 218 Ill. App. 3d 254, 578 N.E.2d 212, 214 (1st Dist. 1991). In this action, on at least one issue, plaintiff must prove "a case-within-a-case-within-a-case"– that he had a valid claim in the employment discrimination case, which would have also been a valid professional negligence claim in his legal malpractice action against the Wisconsin Attorneys. Under this frame work, we shall now review each of McKnight's three claims that defendants committed legal malpractice.

## Demand Letter

McKnight claims in his amended complaint that defendants were negligent when they sent a demand letter to the Wisconsin Attorneys notifying them in early 1993 of McKnight's claim, "thus allowing the Wisconsin attorneys to file suit against McKnight in state court as a preemptive strike." (Pl.'s Am. Compl. ¶ 34(a).) However, McKnight offers no evidence to show that defendants' demand letter was a negligent act that breached their duty to McKnight. No presumption exists under Illinois law that an attorney accused of legal malpractice has breached his duty of care. Shanley v. Barnett, 168 Ill. App. 3d 799, 803, 523 N.E.2d 60, 63 (1st Dist. 1988). Furthermore, Illinois requires the plaintiff in a legal malpractice case to establish through expert testimony the standard of care to which the accused attorney should have adhered. Barth v. Reagan, 139 Ill. 2d 399, 564 N.E.2d 1196, 1199-1200 (1990). In reply to defendants' motion, McKnight attached an affidavit from his proposed expert, Elizabeth Hubbard, Esq. (Pl.'s L.R. 56.1(b)(3) Stmt., Ex. 2.) In it, Hubbard renders her opinion on the conduct of defendants as it relates to their duty to McKnight and their alleged negligence. (Id.) No where in it, however, does Hubbard render an opinion, or even discuss, the demand letter as a breach of defendants' care to McKnight. As a result, McKnight cannot even establish that this letter constituted negligence, much less that it proximately caused him harm. Thus, defendants' motion for summary judgment on this aspect of McKnight's legal malpractice claim is granted.


## Insurance Policy as Sole Means for Recovery

McKnight asserts that defendants were negligent when they advised him before and/or at the mediation that his only recovery against the Wisconsin Attorneys could be from the insurance

policy. (Pl.'s Am. Compl. ¶ 34(c).) He states that Axelrod told him that the $1,000,000.00 policy limit was the "most" he could recover from the Wisconsin Attorneys. (Id. ¶ 29.) McKnight complains that he was not told that he could have recovered more than the insurance policy limit by pursuing the personal assets of the Wisconsin Attorneys. (Pl.'s Resp. at 14.) McKnight argues that but for the negligence of defendants in failing to disclose that McKnight could recover from the Wisconsin Attorneys' personally, he "would have gotten more." (Id.) McKnight's proposed expert Hubbard opines that defendants had a duty to advise McKnight "correctly and truthfully as to the availability of funds beyond the insurance limits." (Pl.'s L.R. 56.1(b)(3) Stmt., Ex. 2, Hubbard Aff. at 11.) According to Hubbard, defendants breached this duty by not advising McKnight that he could recover from the personal assets of Gingras. (Id., Ex. 2, Hubbard Aff. at 11-12.) Hubbard concludes that that conduct was negligent and proximately caused injury to McKnight. (Id.)

Even if we were convinced that defendants' actions constituted negligence, which we are not based on the lack of legal support presented to us, McKnight still loses on causation and damages. McKnight's expert's unsupported conclusion that this conduct proximately caused injury is not sufficient to demonstrate a material issue of fact exists on this claim. McKnight cannot show that a jury could conclude based on the bare evidence he presents on this issue that but for defendants' negligence he would have recovered more money from the settlement. Furthermore, he and his proposed expert offer nothing to show that he suffered some harm as a consequence of the defendant's negligence. See Jones Motor Co., Inc. v. Holtkamp, Liese, Beckemeir & Childress, P.C., 197 F.3d 1190, 1194 (7th Cir. 1999) (affirming summary judgment for defendant law firm because plaintiff's only evidence of damages came from its expert's "bare conclusion" without data support that plaintiff was damaged by law firm's negligence). As defendants point out, the only

circumstance where the personal assets of the Wisconsin Attorneys would have been relevant would have been if a judgment or settlement in excess of the available policy limits had resulted. (Defs.' Joint. Reply at 14.) However, McKnight agreed to settle the matter for less than the policy limit and no where does he claim that he would have walked away from the settlement if he had known that he could have gone after the Wisconsin Attorneys for a judgment in excess of the policy limits. Further, the settlement amount netted McKnight nearly one half of a million dollars, nearly the entire amount he lost when the Seventh Circuit reversed a portion of his judgment against GM. While causation and damages can be tricky concepts in the context of negotiations, see Nicolet Instrument Corp. v. Lindquist & Vennum, 34 F.3d 453 (7th Cir.1994), we find that even in the light most favorable to McKnight, he has no facts to support these prongs of a malpractice claim. Accordingly, defendants' motion for summary judgment on this claim is granted.

## Withdrawal of Affirmative Defense of Legal Malpractice

This last claim appears to be the crux of McKnight's argument that defendants committed legal malpractice. He argues that defendants' failure to disclose to McKnight the consequence of withdrawing his affirmative defense in the state fee action was a breach of their duty to fully and fairly inform a client of foreseeable risks. (Pl.'s Resp. at 11.) Furthermore, according to McKnight's proposed expert, defendants should have appreciated the risk and gone forward with the affirmative defense in the state suit. (Pl.'s L.R. 56.1(b)(3) Stmt., Ex. 2, Hubbard Aff., at 2.) She continues that their failure to do so was negligent and precluded McKnight from later asserting claims for malpractice against the Wisconsin Attorneys for errors at the trial because they were barred by res judicata by the district court in McKnight's federal lawsuit. (Id.) Namely, McKnight argues that

defendants' negligence precluded him from asserting malpractice claims against the Wisconsin Attorneys for their negligence in handling the possible remedies of prejudgment interest and front pay or reinstatement. (Pl.'s Resp. at 11-13.)

As an initial matter, and contrary to plaintiff's assertion, the issues of Gingras' alleged negligence as to his handling of the issues of front pay and reinstatement were still a part of McKnight's federal malpractice suit against the Wisconsin Attorneys at the time he settled the matter in July 1997. The court's 1996 decision on res judicata stated that McKnight's claim on Gingras' failure to file a brief with respect to the issues of reinstatement and front pay survived. (Axelrod Defs.' L.R. 56.1(a)(3) Stmt., Ex. 5, Doc. No. 02273.) Thus, it is not clear to us how defendants are negligent for "waiving" claims that were still technically alive in his lawsuit. While neither McKnight nor his proposed expert ever directly address this procedural issue, we gather from their arguments that the front pay and reinstatement claims, while technically preserved, were never developed before the federal court. If they had been, the district court judge would have seen that they necessarily involved conduct at or right after the trial–conduct that occurred prior to December 31, 1988. Thus, in reality these claims were barred based on the court's underlying holding that all pre-December 31, 1998 conduct was barred from McKnight's malpractice claim.

We shall assume, for purposes of this review, that plaintiff has met the first three prongs of his legal malpractice case: an attorney-client relationship existed; defendants owed a duty to McKnight to warn of the risks involved in withdrawing the affirmative defense and/or a duty to go forward with the defense in the state fee suit; and that their failure to fully advise McKnight of the risks and/or go forward with the defense was negligent and breached that duty. We now review whether McKnight can demonstrate proximate cause that "but for" defendants' negligence the

plaintiff would have prevailed in the underlying action and actual damages. In order to do so, we must review whether McKnight had a viable cause of action for malpractice against the Wisconsin Attorneys for certain conduct at and after trial. In other words, we must see whether McKnight can prove the case-within-the-case-within-the-case.


## Reinstatement

McKnight classifies the reinstatement issue as the "major loss" in his employment discrimination case. (Pl.'s Resp. at 13.) In fact, in his affidavit to this Court in the instant action, McKnight avers that that his "real interest in bringing the suit against GM and after the trial was to get my job back." (Pl.'s L.R. 56.1(b)(3) Stmt., Ex. 1, McKnight Aff. ¶ 9.) In his deposition, McKnight testified that he was interested in reinstatement at GM in "any capacity." (Axelrod Defs.' L.R. 56.1(a)(3) Stmt., Ex. 2, McKnight Dep. at 67.) Plaintiff complains that Gingras had two opportunities to make a compelling case for reinstatement: in his post-trial motion and after remand. (Pl.'s Resp. at 13.) His failure to do so, according to McKnight, was legal malpractice.

At the trial, McKnight testified that since his termination from GM in 1983 where he had earned approximately $35,000.00 per year as a manufacturing supervisor, he had worked as a stockbroker. (Axelrod Defs.' L.R. 56.1(a)(3) Stmt. ¶¶ 44-46, 50-52; id., Ex. 3, McKnight v. General Motors Corp., Trial Tr. IV(B), at 39, 41.) In 1984, McKnight earned $12,600.00 for nine months work as an account executive at Merrill Lynch. (Id. ¶ 45.) In 1985, he was paid $18,600.00. (Id. ¶ 46.) In 1986, he earned $33,000.00 and was terminated by Merrill Lynch in December 1986. (Id.) After leaving Merrill Lynch, McKnight went to work for Oppenheimer and Company as a financial consultant in February 1987. (Id. ¶ 50.) He earned approximately $54,000.00 plus benefits that

year. (Id.) In April 1988, McKnight left Oppenheimer Company to work for Gruntal & Company as a retail broker. (Id. ¶ 51.) He earned almost $13,000.00 between April and August 1988 at Gruntal & Company. (Id.; id., Ex. 3, McKnight, Trial Tr. IV(B), at 48-49.) The employment discrimination trial took place in October 1988. In his brief to this Court, McKnight states that at the time of trial he "had had his fill of the ups and downs of the stock market, was tired of working on a commission basis, and wanted his job at GM back." (Pl.'s Resp. at 4.) It was after the trial that McKnight pressed Gingras to act on his claim for reinstatement. (Id.)

In response to this urging, Gingras filed a post-verdict motion for McKnight's reinstatement to his prior position or to a comparable position. (Id. ¶ 24.) In support of that motion, McKnight executed an affidavit that he was aware of a position available at GM Corporate Finance and Financial Services Division in New York, New York. (Id. ¶ 28; id., Ex. 5, Doc. No. 1636.) He stated that a position with this division would be more "commensurate with my background at this time." (Id. ¶ 29; id., Ex. 5, Doc. No. 1637.) The district court denied McKnight's post-trial motion, holding that "reinstatement in this case would not advance the purposes of Title VII." (Id. ¶ 30; id., Ex. 8, McKnight v. General Motors Corp., 705 F. Supp. 464, 469 (E.D. Wis. 1989).) The court specifically found that McKnight did not have a primary interest in his former position at GM and that, even if he did, the acrimonious relationship between McKnight and GM precluded reinstatement to any managerial position as a productive remedy. (Id.; id., Ex. 8, McKnight, 705 F. Supp. at 469.)

On remand from the Seventh Circuit, Gingras again presented the reinstatement issue to the district court. Gingras argued and submitted a memorandum to the court to reopen the record to receive additional evidentiary submissions on the question of reinstatement. (Id. ¶ 36.) However,

Gingras did not submit any new briefs or arguments to the court, even though he and GM were invited by the Court to do so. The court denied McKnight's request for new evidence on his current, post-trial financial condition. (Id. ¶ 39.) The court also held that, consistent with its first opinion on reinstatement, given McKnight's preference for a different position with GM and the bitter relationship between the parties, that Title VII's reinstatement remedy was not viable in this case. (Id. ¶ 40; id., Ex. 10, McKnight v. General Motors Corp., 768 F. Supp. 675, 680 (E.D. Wis. 1991).) Shortly after this denial, Gingras moved for reconsideration and in support submitted an affidavit by McKnight stating that he would take any managerial position with GM, not limited to corporate finance or investment banking. (Id. ¶ 42; id., Ex. 5, Doc. No. 03991.) The court denied McKnight's request for reconsideration. (Id. ¶ 57; id., Ex. 5, Doc. No. 00726.) The district court's decision was affirmed on appeal. (Id., Ex. 14, McKnight v. General Motors Corp., 973 F.2d 1266 (7th Cir. 1992).)

According to McKnight's proposed expert, Gingras' presentation of this issue to the district court was negligent. (Pl.'s L.R. 56.1(b)(3) Stmt., Ex. 2, Hubbard Aff. at 11.) She opines that "had the information been better presented . . ., it is not improbable that Judge Gordon could well have reached a different decision on the matter." (Id.) The "information" that should have been before the court, according to Hubbard, should have included McKnight's willingness to return to the Oak Creek, Wisconsin production supervisor position and McKnight's views on the "alleged hostility" between McKnight and GM. (Id.)

Defendants argue that even if Gingras were negligent in his presentation of the reinstatement issue to the district court, McKnight cannot demonstrate that the district court would have awarded this discretionary remedy but for Gingras' alleged negligence. (Defs.' Joint Reply at 9.) We agree.

The court explicitly held in its first decision that McKnight "does not have a primary interest in the position that he formerly held." (Axelrod Defs.' L.R. 56.1(a)(3) Stmt., Ex. 8, McKnight, 705 F. Supp. at 469.) While the court's conclusion was based, in part, on the affidavit submitted by McKnight, it also relied on trial testimony that established that McKnight's career goal had changed from manufacturing management to being a stockbroker. (Id.) It also found that the trial demonstrated the bitter relationship between the parties, and given the management level position involved, that reinstatement would be unproductive. (Id.) Thus, even if McKnight had presented an affidavit for his post-trial motion testifying that he wanted his old job back and that he believed he and GM had a salvageable relationship, his trial testimony on his stockbroker career would have contradicted such claims. Furthermore, this testimony would have only confirmed the Seventh Circuit and district court's suspicions that McKnight was pursuing the reinstatement remedy only to induce GM to buy him out or to insure his future employment success, neither of which represent the goals of Title VII. While McKnight argues that Gingras was also responsible for making the trial record, the facts speak for themselves: McKnight pursued a career as a stockbroker and the broken-down relationship between the parties was evident by the contentious litigation record before the court. Thus, we believe that the district court would not have granted reinstatement as a Title VII remedy even if it had been presented with all of the information that McKnight believes Gingras negligently failed to supply.

McKnight's failure to demonstrate a causal relationship between Gingras' negligence and the district court's decision means that Gingras did not commit malpractice on the reinstatement issue. Thus, defendants' alleged negligence for not preserving this issue for the malpractice action

did not cause harm to McKnight. As a result, defendants' motion on their conduct on the reinstatement issue is granted.

## Front Pay

McKnight argues that Gingras failed to present any case to the district court for a front pay award. He claims that Gingras had at least two opportunities to do so: in the post-trial motion and on remand as an alternative to the reinstatement remedy. (Pl.'s Resp. at 12.) Again, according to McKnight and his proposed expert, this failure was legal malpractice.

While Gingras did not raise front pay in the post-trial motion, he did address it on remand, as suggested by the Seventh Circuit in its remand order. However, Gingras did not file a brief on the issue or calculate what the award of front pay should be. In its opinion, the district court held that an award of front pay was not appropriate in McKnight's case:

> Mr. McKnight presented evidence to the jury regarding his employment future. The jury reasonably found that Mr. McKnight did not lose future earnings as a result of the discrimination he suffered at the hands of the defendant. Mr. McKnight earned considerably more money after his termination from General Motors. I am persuaded that Mr. McKnight's employment opportunities were not and are not inferior to his employment at General Motors.

(Axelrod Defs.' L.R. 56.1(a)(3) Stmt., Ex. 10, McKnight v. General Motors Corp., 768 F. Supp. 675, 680 (E.D. Wis. 1991).) This decision was affirmed by the Seventh Circuit, noting that the contradiction between McKnight's trial testimony of a successful stockbroker career and his post-trial "desperate" financial condition appeared to be an attempt to "force GM to insure his future employment success." (Id., Ex. 14, McKnight v. General Motors Corp., 973 F.2d 1366, 1372 (7th Cir. 1992).)

Again, we find that McKnight fails to establish the causal link between Gingras' negligence and the district court's denial of front pay. The evidence at trial clearly demonstrated that McKnight earned as much or more some years as a stockbroker as he did as a manufacturing manager at GM. The district court, in rejecting McKnight's attempt to put in evidence of his post-trial financial distress, found that the equitable remedy of front pay was not warranted when McKnight was making as much or more in his new career. Neither McKnight nor his proposed expert present any evidence to us that could have been presented to the district court that would have likely entitled him to front pay. Front pay is cut off as of the date the plaintiff found, or should have found, comparable employment. Williams v. Pharmacia, Inc., 137 F.3d 944, 954 (7th Cir. 1994). Comparable work means a position with "virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status" as the prior position. Best v. Shell Oil Co., 4 F. Supp.2d 770, 775 (N.D. Ill. 1998). McKnight does not argue or show that his career as a stockbroker was not comparable in every sense to his job at GM. He only states that he was fed up with the unpredictability of the stock market. As the Seventh Circuit stated on his appeal, front pay is not designed to insure the plaintiff's financial success. Thus, McKnight was not entitled to front pay, so Gingras did not commit malpractice by his handling of the front pay issue. Accordingly, defendants' alleged negligence did not cause harm to McKnight in his malpractice case against the Wisconsin Attorneys.

**Prejudgment Interest**

McKnight's final argument is that Gingras committed malpractice because he failed to raise in the post-trial motion the request for prejudgment interest on McKnight's back pay award. When

Gingras did raise it on a motion for reconsideration after the remand order from the Seventh Circuit, the district court rejected the request because it was untimely and should have been raised in the post-trial motion. (Axelrod Defs.' L.R. 56.1(a)(3) Stmt.; id., Ex. 10, McKnight, 768 F. Supp. at 683.) Plaintiff points out that several months before McKnight's trial the Supreme Court had ruled in Loeffler v. Frank, 486 U.S. 549 (1988), that Title VII authorized prejudgment interest as a "make whole" remedy. While this is true, it was a remedy within the discretion of the district court.

Unlike our findings on the reinstatement and front pay issues, we conclude that but for Gingras' negligence in failing to timely raise the prejudgment interest remedy the district court may have awarded prejudgment interest on the $55,000.00 back pay award. Although the remedy is discretionary, the district court declined to exercise its discretion solely on the tardiness of the request. Thus, it is possible that Gingras' negligence caused harm to McKnight that resulted in an actual loss in award.

However, can we cannot make the same conclusion about the effect of defendants' conduct. It is not clear that McKnight suffered any injury at all from the defendants' allegedly negligent procedural loss of this claim in his legal malpractice case against the Wisconsin Attorneys. McKnight recovered a settlement from the Wisconsin Attorneys that exceeded his original jury verdict by more than $150,000.00. While McKnight has not calculated what the prejudgment interest award would have been, we can surmise that interest on $55,000.00 for five years does not surpass the higher settlement award that plaintiff obtained. Thus, while Gingras may have committed malpractice on this issue, McKnight has not shown that he was injured by defendants' negligence in losing this claim.

In sum, defendants' alleged negligence stemming from their withdrawal of the affirmative defense did not cause harm or result in damage to McKnight. As a result, defendants' motion on this claim is granted.

## Conclusion

Even when we construe all of the facts in the light most favorable to McKnight, he still cannot show that there is a genuine issue of material fact to support any of his claims that defendants committed legal malpractice in their representation of him in the underlying legal malpractice claim. Therefore, we grant defendants' motion for summary judgment on all of McKnight's legal malpractice claims. This is a final and appealable order.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

**DATED:** 5-25-00